IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTTY THYNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIV. NO. 05-10987-RGS |
| ) | |
| FEDERAL EMERGENCY ) | |
| MANAGEMENT AGENCY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AND OPPOSITION TO REQUEST FOR INJUNCTIVE RELIEF**

This case involves the Federal Emergency Management Agency's (hereafter FEMA's) proposed revision of a federal Flood Insurance Rate Map (FIRM) that, when final, would increase the area on Plaintiff Scotty Thyng's (hereafter, Thyng's) Quincy, Massachusetts, oceanfront property that is designated a Special Flood Hazard Area (SFHA). Thyng challenges FEMA's Letter of Map Revision (LOMR), alleging that FEMA's proposed revision is tortious and unconstitutional. FEMA[1] requests that the Complaint be dismissed because Thyng cannot, as a matter of law, prevail on his claim for compensation, whether in tort or under the Fifth Amendment "takings" clause, since FEMA has not waived sovereign immunity for a tort claim and has not "taken" Thyng's land. Moreover, if Thyng had requested judicial review of FEMA's revision of the FIRM relating to his property, he could not have prevailed because he failed to produce

---

[1] FEMA is an organizational element of the United States Department of Homeland Security, an agency of the United States. FEMA's functions, personnel and liabilities were transferred to the Secretary of the Department of Homeland Security (DHS) pursuant to section 503 of the Homeland Security Act of 2002.

scientific or technical evidence to negate or contradict FEMA's decision, as is required by 42 U.S.C. § 4104.  Accordingly, judicial review cannot be of assistance to Thyng and, respectfully, the proper avenue for his concerns is presentation of new scientific or technical evidence to justify his allegations that his property is not prone to flooding. Finally, the gravamen of Thyng's complaint is not FEMA's activity but the City of Quincy's refusal to permit him to develop the property.  FEMA does not make local land use decisions such as issuing building permits – which is a local function -- but only maps the flood risk of land areas based on the available evidence.

## I. BACKGROUND OF THE CASE

### A. The National Flood Insurance Program

Historically, floods have been one of the most destructive national hazards. The federal government initially addressed the problem by funding local flood-control projects.  However, after billions of federal dollars were spent in flood-control projects, the personal hardships and economic distress from floods continued to increase – largely as a result of unwise building on the nation's flood plains.[2]  The National Flood Insurance Act (NFIA), 42 U.S.C. §§ 4001 et seq., authorizes establishment of the National Flood Insurance Program (NFIP).  The NFIP is a voluntary, community-based program designed to provide a reasonable method of sharing the risk of flood losses through a program of federally-subsidized flood insurance that encourages preventative and protective measures.  42 U.S.C. § 4001(a).  The NFIP has two principal objectives: first, to provide relief from the destruction caused by floods and to reduce the "massive and ever increasing burden of federal flood disaster assistance" by making flood insurance

---

[2] S. REP. NO. 93-583, 1973 U.S.C.C.A.N. 3317, 3218-19.

available at reasonable premium rates; United States v. Parish of St. Bernard, 765 F.2d 1116, 1122 (5th Cir. 1985), 42 U.S.C. § 4001(a)(1).  As a condition for the availability of federally-subsidized flood insurance, local jurisdictions are required to enact land use and control measures designed to guide the rational use of the flood plain. 1973 U.S.C.C.A.N. at 3219; 42 U.S.C. § 4001(a); Flick v. Liberty Mut. Fire Ins. Co., 205 F.3d 386, 388 (9th Cir. 1999); Nelson v. Becton, 929 F.2d 1287 (8th Cir. 1991).  In return for eligibility for federally-supported flood insurance, flood-prone communities are required to adopt local flood plain management measures that restrict construction, where practicable, on locations that are threatened by floods, based, at a minimum, on FEMA minimum flood plain management criteria.  42 U.S.C. §§ 4001(c), 4002(b), 4022, 4102; 44 C.F.R. § 59.22. 1973 U.S.C.C.A.N. at 3220.  Jamal v. Travelers Lloyds of Texas Ins. Co., 129 F. Supp. 2d 1024, 1027-28 (S.D. Tex. 2001) (description of the flood program); 42 U.S.C. § 4002(b).  See Texas Landowners' Rights Ass'n v. Harris, 453 F. Supp. 1025, 1027 (D.D.C. 1978) (description of the program), aff'd, 598 F.2d 311 (D.C. Cir. 1979).  FEMA is authorized to determine flood elevations, publish flood maps identifying flood-risk zones, and set flood insurance rates for the various zones.  42 U.S.C. § 4101(e),(f), (h),(i), 4101, 4104(a), 4014, 44 C.F.R. § 59.1, 64.3(a)(1);  Reardon v. Krimm, 541 F. Supp. 187 (D. Kan. 1982).  42 U.S.C. § 4101(a).  FEMA publishes a Flood Insurance Study and a FIRM for each community, which delineates the special flood hazard areas and the insurance premium zones applicable to the community.  44 C.F.R. §§ 59.1, 64.3.  See Garcia v. Omaha Prop. & Cas. Ins. Co., 933 F. Supp. 1064, 1066 (S.D. Fla. 1995).[3]  The

---

[3] The FIRM identifies the applicable Special Flood Hazard Area ("SFHA") by zone and appropriate risk.  See 44 C.F.R. §§ 59.1; 64.3.  The various premium rate zones are identified by symbol, as set forth in 44 C.F.R. § 64.3(a)(1).  For example, relevant zone designations include:  Zones AE and A1-A30, which are the flood insurance rate zones that correspond to the 1-percent annual chance floodplains that are determined in the Flood Insurance Study by detailed methods of analysis. In most instances, Base Flood

FIRMs are used to set requirements and rates for flood insurance policies for existing structures, and they are used by localities for land use planning, such as development prohibitions, zoning and building permits for new structures, as well as by lending institutions. 42 U.S.C. §§ 4102, 4104, 4104a. See Woodhill Corp. v. FEMA, 168 F.3d 1025 (7th Cir. 1999) (use of FEMA maps).

An interested party or community also may seek changes in FIRMs through LOMRs or Letters of Map Amendments ("LOMAs"), which revise maps based on new information or changed conditions. A LOMR is based on more accurate and more detailed scientific information or information showing that conditions have changed, whether naturally or manmade, such that the base flood elevation has changed or particular land has been elevated out of the Special Flood Hazard Area ("SFHA") or is within the SFHA. See 44 C.F.R. Part 65 (regulations pertaining to flood map revisions). A LOMA is a FEMA determination that applies detailed, site specific information to assess in greater detail than the FIRM alone the flood hazard on a property. 44 C.F.R. Part 72.

FEMA's flood mapping starts with a determination of the elevation of a 100-year

---

Elevations derived from the detailed hydraulic analyses are shown at selected intervals within this zone. . . . Zone VE is the flood insurance rate zone that corresponds to areas within the 1-percent annual chance coastal floodplain that have additional hazards associated with storm waves. . . . Zones B, C, and X are the flood insurance rate zones that correspond to areas outside the 1-percent annual chance floodplain, areas of 1-percent annual chance sheet flow flooding where average depths are less than 1 foot, areas of 1-percent annual chance stream flooding where the contributing drainage area is less than 1 square mile, or areas protected from the 1-percent annual chance flood by levees. No Base Flood Elevations or depths are shown within this zone. Insurance purchase is not required in these zones.

http://www.fema.gov/fhm/fq_gen13.shtm. See Declaration of Emily Hirsch ¶ 4.

flood, the Base Flood Elevation ("BFE"),[4] which is then used with other information and characteristics of the land and water to identify flood hazards.  A private person may appeal the BFE to the local government within ninety days of the second publication of the proposed FIRM in the local newspaper.  "The sole basis for such appeal shall be the possession of knowledge or information indicating that the elevations being proposed by the Director . . . are . . . scientifically or technically incorrect."  42 U.S.C. § 4104(b)-(d), 44 C.F.R. Part 67.  After FEMA's final determination, a community that opts to participate in the NFIP is required to adopt local land use and control measures consistent with the BFE.  42 U.S.C. § 4104(d).

Judicial review is limited to whether, on the administrative record, FEMA was arbitrary and capricious when it decided the plaintiff failed to provide on appeal appropriate evidence to show the proposed BFE and FIRM were "scientifically or technically incorrect."  42 U.S.C. § 4104(g).  see Reardon v. Krimm, 541 F. Supp. 187, 189 (D. Kans. 1982); City of Wenatchee v. United States, 526 F. Supp. 439 (E.D. WA. 1981); City of Biloxi v. Giuffrida, 608 F. Supp. 927 (S.D. Miss. 1985).

**B. Thyng's Application to FEMA**

Thyng is the owner of a parcel of oceanfront land at 202 Manet Avenue, Quincy, part of which was included in a SFHA.  Declaration of Emily Hirsch (Hirsch Dec.) ¶ 4.  Thyng applied to the Town of Quincy Conservation Commission for permission to build on the property, but the application was denied.  In 2003, Thyng requested a LOMA to

---

[4] Base flood is defined as "the flood having a one percent chance of being equaled or exceeded in any given year."  44 C.F.R. § 59.1.   A public notice is required of a proposed BFE or proposed change in BFE: the local community is notified; and notice is published in the Federal Register and published twice in "a prominent local newspaper."  42 U.S.C. § 4104(a).

remove his property entirely from the SFHA based on alleged errors in the FIRM. Id. ¶ 5. Thyng represented that the lowest elevation of the property, so-called Section One, was higher than the BFE. FEMA amended the FIRM, August 28, 2003, but in so doing, determined that a portion of Thyng's property was below the BFE and should remain as a SFHA. Id. Thyng then, by letter dated June 18, 2004, submitted a request to FEMA for a LOMR that would revise the FIRM to remove all of his property from the SFHA, based largely on the existence of a seawall on the ocean edge of the property. Id. ¶ 6 and Exhibit 1, attached thereto. Thyng provided no additional scientific or technical data (namely information to address the sea wall's height and ability to withstand the 1% annual chance flood event or a storm wave height analysis) to FEMA with his request, except that he submitted a more detailed and up to date topographic information on his property than FEMA had seen before. Id.

     On August 17, 2004, a FEMA mapping contractor requested that Thyng provide additional data in support of his LOMR. Specifically, the contractor requested: a signed copy of MT-2 Form 1 ("Overview and Concurrence Form"), as-built plans, back-up documentation and calculations, maintenance plan and MT-2 Form 3 ("Coastal Structures Form") for the seawall; a site-specific, detailed coastal flood hazard analysis using a Wave Height Analysis for Flood Insurance Studies model and a wave runup model; a certified topographic map for the entire parcel, and an annotated FIRM. Id. ¶ 7.

     Thyng did not provide the information. Instead, on August 30, 2004, Thyng responded to the FEMA contractor by e-mail asking that FEMA confirm the LOMA and alleging that Section One of his property is outside of the SFHA, that there is a 30-foot (wave) splash zone behind the seawall separating the ocean from the proposed construction; and that the top of the seawall is at Elevation 12.3 feet NGVD'29 and would contain the 100-year storm (except for the splash zone).

On October 21, 2004, FEMA issued a Special Response letter to Thyng indicating that his property lies in three effective flood hazard zones (Zone A3, with an elevation of 13 feet National Geodetic Vertical Datum ("NGVD"), Zone A3 elevation 11 foot NGVD, and Zone C). Id. ¶ 9, and Exhibit 3, attached thereto. Specifically, FEMA's review of the topographic data submitted by Thyng indicated that a significant portion of Section One is located below the established BFE of 11 feet NGVD and therefore, is still located in the flood zone (Zone A3), and there is a "splash zone" typically depicted as a Coastal High Hazard Area (Zone V). FEMA also stated that a detailed analysis of wave runup and wave overtopping had not been performed for the seawall, that the seawall was not reflected on the effective FIRM, and accordingly, that FEMA could not ascertain whether the seawall offered flood protection. FEMA also told Thyng that he could add updated and/or more detailed hydrologic, hydraulic, and/or topographic data in support of his LOMR request. FEMA's Special Response letter was based on a review of the existing information used to prepare the effective Flood Insurance Study and FIRM and on the more detailed topographically information submitted by Thyng. Id.

On January 5, 2005, FEMA issued a proposed LOMR revising the FIRM for the City of Quincy, to become effective on April 22, 2005. The LOMR proposed that the FIRM would be revised to increase, rather than decrease, the Special Flood Hazard Area on Thyng's property, rather than decrease the area, leaving only a portion of the property outside of the designated flood plain. Id. ¶ 10, and Exhibit 4, attached thereto.

Thyng appealed the LOMR to FEMA. See id. ¶ 12. However, he submitted no additional scientific or technical evidence in support of his appeal. He submitted a letter dated August 30, 2004 from Dean Savramis, a FEMA Mitigation Division employee with responsibility over NFIP mapping issues, responding to a facsimile sent by Thyng on August 27, 2004. Id. and Exhibit 5-A, attached thereto. The Savramis letter explained

7

that a LOMA issued for development purposes may be subject to State or local flood plain management requirements that are more stringent than FEMA's minimum standards. Thyng stated in his appeal letter that he had met with Savramis on September 20, 2003, and that Savramis had provided him with a topographical map, which map was attached as an exhibit to Thyng's appeal. See id. and Exhibit 5-B, attached thereto. On that map, Thyng had superimposed the "11' NGVD contour line" that he asserted was identical "within a few feet horizontally" of a field topographic survey that he claimed to have done independently. He stated that he had previously been granted a LOMA on the property, and asserted – without supporting evidence – that "it became clear that the edge of the SFHA in the FIRM was intended to be the seawall." Id. ¶ 14. He stated that the FEMA contractor had suggested that a field topographic "could probably remove the entire parcel from the SFHA as it was fairly obvious that the curvilinear line was indicative of a seawall." Id. Thyng stated he did not undertake such a survey because his "foundation needed 25' setback anyway and the line was only @ 30' from the seawall." Id. Thyng explained in his appeal that FEMA "has confused the seawall line with the 11" NGVD topo grade and feels the "LOMA was 'way off.' This is obviously untrue as even the topo you provided shows the grade line roughly where it ended up." Id. ¶ 15. Thyng identified the primary point in his appeal as:

> More importantly however is to get back to the original purpose of my submission, which [FEMA] does not even address. The combination lot of primarily A3-11 is fully protected by modern poured concrete seawall built in 1960 by state and federal agencies to code and which has elevation of 12.3 NGVD – effectively protecting and removing the entire parcel from SFHA.

Id. and Exhibit 5. Thyng did not address FEMA's conclusion in the Special Response Letter that the effectiveness of the seawall had not been tested or verified, and he did not

8

present any evidence to contradict FEMA's conclusions regarding the seawall or evidence regarding the impact of storm waves.[5]  Finally, Thyng represented that he lived in a house next door to the subject property that did not sustain major damage after a storm in 1991, and he attached a flood insurance claims file to show that the flooding experienced was limited.  See id. ¶ 17 and Exhibit 5-G, attached thereto.

FEMA denied Thyng's appeal, concluding that Thyng had not submitted additional scientific and technical data that contradicts FEMA's Base Flood Evidence determination such that it would warrant a revision to the April 22 LOMR.  Specifically missing were a coastal flood hazard analysis and back-up documentation and calculations for the seawall, as well as storm wave splash zone data.  Without that information, FEMA had no appropriate scientific or technical basis to revise the FIRM.  The information that Thyng did provide to FEMA, and other information available to FEMA, indicated that portions of the property were below the base flood elevation and that the seawall would be overtopped by the storm surge during the base flood height.[6]  Id. ¶ 18.

---

[5] Thyng also attached to his appeal miscellaneous correspondence, maps, portions of the U.S. Geological Survey Water-Resources Investigations 79-61 report entitled "Coastal Flood of February 7, 1978, in Maine, Massachusetts, and New Hampshire" dated 1979, and other information that he previously had submitted to FEMA or to the FEMA contractor.  See id. ¶ 16 and Exhibits 5-C, 5-D, 5-E, and 5-F, attached thereto.  The attached correspondence speculated as to the sources of flooding in the areas surrounding Thyng's property and attempted to distinguish his property from other flood hazard areas.  As noted, Thyng did not submit scientific evidence, specifically hydraulic or hydrologic evidence, to show that the Base Flood Elevation by FEMA was in error.

[6] To change this determination on the seawall and the mapping of the floodplain, FEMA would require the information as set forth in its *Guidelines and Specifications for Flood Hazard Mapping Partners Appendix D Guidelines for Coastal Flooding Analyses and Mapping* Pages D-29 and D-30.  See http://www.fema.gov/pdf/fhm/frm_gsad.pdf.  These guidelines explain that to credit the seawall as providing protection against flood, FEMA requires an engineering certification that the wall is stable and will withstand the base flood.  At the time of the appeal FEMA had so little information on the seawall that it was unable even to assess if it is stable and will remain intact though a base flood and whether it will be high enough to keep the storm surge off of the property.  If the seawall were able to be certified, but is not of sufficient height to prevent sea water from the property, FEMA would still be unable to determine the amount of overtopping and how far back the splash zone from the overtopped seawall because the Agency

FEMA has no record of an administrative tort claim filed by Thyng. Declaration of Edward Broyles ¶ 3.

Thyng filed an action for an injunction and damages against FEMA in Suffolk Superior Court on April 20, 2005, together with a motion for preliminary injunction against the LOMR proposed by FEMA. The Complaint alleges that FEMA is responsible for damages of $1,000,000 for misrepresenting "the process for Thyng to build on his valuable land during a three-year period," and "illegal land taking and a temporary eminent domain taking without compensation." The Complaint requests that FEMA be enjoined to remove Plaintiff's "property upland of the seawall from the SFHA" and "revise the BFE to 10 NGVD in accordance with his submissions of 1/7/04." Finally, the Complaint seeks an "immediate injunction" barring FEMA from finalizing its proposed alterations in its LOMR -- the flood map encompassing Plaintiff's property -- alleging that the alterations are "hastily prepared and ill-advised." The government did not appear; and in its absence, on April 21, 2005, the Superior Court issued an order temporarily restraining FEMA from finalizing the proposed LOMR. The state court action was removed to this Court on May 12, 2005. The government filed an Answer on May 18, 2005. On May 27, 2005, this Court issued an Order "maintaining the status quo until the government has an opportunity to file a response to the motion for a temporary injunction."

On July 27, 2005, FEMA denied Thyng's appeal. Hirsch Dec. at ¶ 19 and Exhibits 6 and 7, attached thereto. Pursuant to the Order of this Court, FEMA stayed its denial of Thyng's appeal pending this Court's consideration of Thyng's claim.

---

does not have a certified elevation of the seawall height.

## II.  THE LEGAL STANDARDS

### A.  The Applicable Standard Under Rule 12(b)

The Complaint is subject to dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and (6), Federal Rules of Civil Procedure.  In deciding a motion to dismiss under Fed. R. Civ. P. 12, the Court must accept all well-pleaded factual assertions as true and draw all reasonable inferences from these assertions in the plaintiff's favor.  See Scheuer v. Rhodes, 416 U.S. 232, 286 (1974).  Aybar v. Crispin-Reyes, 118 F.3d 10, 13 (1st Cir. 1997).  In order to survive a motion to dismiss, a plaintiff must assert all "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).  Although all inferences must be made in the plaintiffs' favor, the court need not accept "bald assertions, unsupportable conclusions, . . . and the like." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996), and "will not accept a complainant's unsupported conclusions or interpretations of law." Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993).  Dismissal is proper only when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1937).

### B.  The Standard for Preliminary Injunction

A preliminary injunction is appropriate where the moving party meets each of four prerequisites: (1) the movant has established that she is likely to succeed on the merits. Pharmaceutical Research & Manufacturers v. Concannon, 249 F.3d 66 (1st Cir. 2001), aff'd, Pharmaceutical Research & Manufacturers v. Walsh, 538 U.S. 622 (2003) (This is

the "main bearing wall" of the four factor framework. Ross-Simmons of Warwick v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)); and the "threshold criteria." Maine State Bld'g Trades Council v. Chao [cite] Rencor, 230 F. Supp.2d at 102 [cite]. (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. Ross-Simmons of Warwick, Inc., 102 F.3d at 15; see DeNovellis v. Shalala, 135 F.3d 58, 64 (1st Cir. 1998); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

The movant bears the burden of demonstrating irreparable harm. Ross-Simmons of Warwick, 102 F.3d at 18. The injury must not be adequately compensable by money damages. See, Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (collecting cases); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989). The other factors required for preliminary injunction are "matters of idle curiosity" when Plaintiff cannot demonstrate a likelihood of success on the merits. New Comm. Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

Injunctive relief is not available to enjoin a "taking" under the Fifth Amendment to the Constitution. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127-28 (1985) (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-17 (1984)). This is because the Tucker Act, 28 U.S.C. § 1491, provides a monetary remedy for the property owner.

### III.   THYNG IS NOT ENTITLED TO THE RELIEF SOUGHT

Thyng cannot establish the elements required for injunctive relief, whether interim or

final. Moreover, he cannot prevail in his request for compensation, whether in tort or under the Fifth Amendment to the U.S. Constitution. Thyng made no claim under the NFIA, but had he made such a claim, he could not have prevailed.

**A. <u>Sovereign Immunity has not been Waived for Thyng's Tort Claim.</u>**

The United States is immune from suit unless it has expressly consented to be sued. <u>United States v. Mitchell</u>, 445 U.S. 535 (1980). The burden is on the plaintiff to establish a waiver of sovereign immunity before a suit against the United States is permitted. <u>Block v. North Dakota</u>, 461 U.S. 273, 287 (1983). <u>See</u> <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976) (federal government is "absolutely shielded from tort actions for damages unless sovereign immunity has been waived."). Sovereign immunity is a jurisdictional bar to suits against the federal government and its agencies. <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994).[7]

**(i) Thyng's Claim Falls Within the Misrepresentation Exception to the FTCA.**

Sovereign immunity has been waived by the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1), for claims for tort monetary damages:

> For injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

---

[7] Where a plaintiff has not pleaded and proved compliance with this jurisdictional prerequisite, he cannot survive a motion to dismiss. <u>Eveland v. Director, CIA</u>, 843 F. 2d 47 (1st Cir. 1988).

However, this waiver of sovereign immunity is circumscribed by a number of exceptions. See 28 U.S.C. § 2680(a)-(n). Bolduc v. United States, 402 F. 3d 50, 55 (1st Cir. 2005). Subsection (h) of 28 U.S.C. § 2680 creates exceptions for the claims arising out of misrepresentation and deceit. If a plaintiff's claim falls "within the compass of these exceptions," it is "outside the ambit of federal subject matter jurisdiction." United States v. Neustadt, 366 U.S. 696, 702 (1961) (allegations that the United States negligently inspected and appraised a home financed by the Federal Housing Administration was essentially a negligent misrepresentation claim and barred by subsection 2680(h)). Muniz-Rivera v. United States, 32 F.3d 8, 12-13 (1st Cir. 2003).[8] Because the Complaint seeks compensation from the United States for a tort that is expressly barred by the FTCA, this Court lacks jurisdiction to decide the claim.[9]

**(ii) Thyng Failed to File a Tort Claim with FEMA.**

Under the FTCA, 28 U.S.C. § 2675, a condition of the waiver of sovereign immunity is the filing of a timely written claim upon the appropriate federal agency. See 28 U.S.C. §§ 2401(b); 2675(a). Attalah v. United States, 955 F. 2d 776, 779 (1st Cir. 1992). This claim is to give notice to the government of the nature of the claim and the amount of damages requested. See Santiago-Ramirez v. Sec'y of Dept. of Defense, 984

---

[8] As with all waivers of sovereign immunity, the tort waiver must be "construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires." Id., citing United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994).

[9] Thyng has provided no basis whatsoever for his allegations of misrepresentation and his claim seems to lie against the locality rather than FEMA, since FEMA does not make local land use decisions. United States v. Parish of St. Bernard, 765 F.2d 1116 (5th Cir. 1985).

F. 2d 16, 17 (1st Cir. 1993). <u>Commonwealth of Pennslvania by Sheppard v. National Ass'n of Flood Insurers</u>, 520 F.2d 11, 19 (3rd Cir. 1975) (requirement of administrative claim under the FTCA applies to FTCA suits under the NFIP). The purpose of this requirement is to allow the agency to investigate and perhaps settle the dispute before a suit is filed. See <u>Santiago-Ramirez v. Sec'y of Dept. of Defense</u>, 984 F. 2d 16, 17 (1st Cir. 1993) (citing legislative history). The administrative claim requirement is jurisdictional, and a complaint is to be dismissed where a party fails to present a tort claim to the appropriate agency before commencing suit. <u>McNeil v. United States</u>, 113 S. Ct. 1980, 1983 (1993); <u>Richman v. United States</u>, 709 F.2d 122, 123-4 (1st Cir. 1983).

As noted, Thyng has filed no tort claim with FEMA. His failure to file a tort claim and the fact that his claim, if ripe, would be barred as an exception to the FTCA, require dismissal of his tort claim for lack of jurisdiction.

**B. <u>No Fifth Amendment "Taking" Has Occurred</u>**

Thyng claims that FEMA's revision of the Quincy FIRM "amounts to an illegal land taking and a temporary eminent domain taking without compensation." His claim has no support in law. Plaintiff's claim of a "temporary taking" of his property appears to rest on the period of time that FEMA took to make its final decision above the LOMR. However, the Supreme Court has held that the time that developers are required to wait while the government makes land use decisions cannot constitute injury to property rights of the dimension required for a Fifth Amendment claim. See <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 535 U.S. 302, 331-32 (2002); <u>Penn Central Transp. Co. v. City of New York</u>, 438 U.S. 104, 124 (1978).

More fundamentally, the Fifth Amendment is not applicable <u>at all</u> against FEMA's activities under the NFIA. The NFIP is a voluntary, "carrot and stick" program. As noted, FEMA conditions the availability of federally-subsidized insurance upon participation in the NFIP, including local enactment of local flood-plain management ordinances in accord with minimum federal standards. State or local governments have a strong incentive to participate in the program, but their participation is not mandatory. <u>Adolph v. FEMA</u>, 854 F.2d 732, 735 (5th Cir. 1988). Localities are to weigh the federal benefits against the limitations on future development that require building in a safe manner so there will be no damage from future flooding. <u>Id</u>. at 735. Because the program is voluntary,[10] "the NFIP is not a taking as a matter of law;" <u>Id</u>. at 736. The specific facts of Thyng's property are "irrelevant" to whether "takings" law is applicable. <u>Id</u>. <u>See</u> <u>B&G Enterprises, Ltd. v. United States</u>, 43 Fed. Cl. 523, 525-26 (1991) (discusses inapplicability of Fifth Amendment to other federal conditional programs).[11]

---

[10] A number of conditional federal programs have been upheld as not "takings", including speed-limit reductions, minority set-asides, and drinking-age requirements as a condition of federal highway funding. <u>Id</u>. at 735. <u>See</u> <u>Texas Landowners Rights Ass'n v. Harris</u>, 453 F. Supp. 1025, 1031 (D.D.C. 1978) (dismissing Fifth Amendment claim in NFIP case: "The federal government traditionally obtains state cooperation and participation in federal regulatory program[s] by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving.").

[11] Even if "takings" law were applicable, Thyng's claim would fail. The test for a taking is not whether a developer's property has diminished in value due to public regulation, but whether the value has been diminished to the point where the property "as a whole" is economically useless; <u>Penn Central Transp. Co. v. City of New York</u>, 438 U.S.at 131, which Thyng does not even allege, and whether the program is unreasonable in protecting a legitimate public interest. <u>Goldblatt v. Hempstead</u>, 369 U.S. 950, 970 (1962). <u>See</u> <u>Texas Landowners</u>, 453 F. Supp. at 1032 (on balance, "public safety, health, and welfare favors the program"). <u>See</u> also, <u>Grenier v. Zoning Board of Appeals of Chatham</u>, 444 Mass. 754, 759, 764 (2005) (town reasonable in refusing permit to build residence within flood zone; property not shown to lose substantially all economic value).

Finally, this Court has jurisdiction over "takings" claims of only $10,000 or less. Exclusive authority for "takings" claims in excess of $10,000 is vested in the United States Court of Federal Claims. 28 U.S.C. § 1491(a)(1). Because Thyng seeks an amount of $1,000,000 under the "takings" caluse, he cannot establish subject matter jurisdiction in this Court. New Mexico v. Regan, 745 F.2d 1318, 1322 (10th Cir. 1984).

**C. Thyng Cannot Prevail Under the NFIA**

The scope of review of final FEMA actions under the NFIA, 42 U.S.C. § 4104(c), is limited to whether FEMA was arbitrary and capricious in determining that Thyng failed to present scientific or technical "data that tend to negative or contradict the Director's finding . . . ."[12] 42 U.S.C.4104(e); see Falls Chase Special Taxing Dist. v. Director, FEMA, 580 F. Supp. 967, 970 (N.D. Fla. 1983). When seeking judicial review under 42 U.S.C. § 4104(g), a Plaintiff is not entitled to a *de novo* hearing, but must establish that on the administrative record, FEMA was arbitrary and capricious when it decided the plaintiff failed to provide appropriate scientific or technical evidence on appeal to show the proposed BFE and FIRM were incorrect. 42 U.S.C. § 4104(g); see Reardon v. Krimm, 541 F. Supp. 187, 189 (D. Kans. 1982); City of Wenatchee v. United States, 526 F. Supp. 439 (E.D. WA. 1981); City of Biloxi v. Giuffrida, 608 F. Supp. 927 (S.D. Miss. 1985).

As noted in section I(B) of this memorandum, the information submitted by Thyng

---

[12] Thyng did not assert a claim under 42 U.S.C. § 4104 in his Complaint. However, since FEMA has now decided Thyng's administrative appeal, the applicable law under the NFIP is provided for the assistance of the Court.

with his FEMA did not meet the applicable standard, since he merely submitted a letter explaining his personal disagreement with FEMA's conclusion in the proposed LOMR, together with documents previously submitted and previously considered and rejected by FEMA.  Thyng's primary argument is that the seawall on the ocean edge of his property provides adequate protection against flood, storm surge, and storm waves, and that a set-back of thirty feet for construction provided adequate protection against storm wave splash, despite the fact that the information submitted did not support his argument because it did not show, through scientific or technical analysis, that the seawall is of sufficient strength and height to provide protection.  Plaintiff submitted no hydrologic or hydraulic data, or any technical information to negate or contradict FEMA's calculations.  He did not present a coastal flood hazard analysis or back-up documentation, or calculations for the seawall.  He did not provide an engineering certification that the seawall is stable and capable of withstanding the base flood, or information about storm wave splashes.  In other words, he clearly failed to meet his burden on appeal.  Indeed, Thyng's position under the NFIA cannot come close to prevailing because he submitted no evidence at all to FEMA beyond what FEMA had already considered in its LOMR revision.  FEMA determined that the BFE at the location was properly eleven feet and that the topographic information showed that much of Thyng's property was lower than eleven feet.

Accordingly, because Thyng presented no substantive challenge to FEMA's decision, he could not prevail in any challenge that he might have raised under the NFIA, 42 U.S.C. § 4104.

## IV.  **CONCLUSION**

For the foregoing reasons, this Court lacks authority to provide the relief sought by Thyng, and the Complaint should be dismissed.

                          Respectfully submitted,

                          MICHAEL J. SULLIVAN
                          United States Attorney

By:   /s/ Anita Johnson
        ANITA JOHNSON
        Assistant U.S. Attorney
        U. S. Attorney's Office
        John Joseph Moakley
        United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA  02210
        (617)748-3100

Of Counsel:

Jordan S. Fried
Associate General Counsel for Litigation
Federal Emergency Management Agency
500 C Street S.W., Suite 840
Washington D.C. 20472

## Certificate of Service

I hereby certify that I have served the foregoing upon Scotty Thyng, P.O. Box 990813, Boston, Massachusetts 02109, by first facsimile transmission and by first class mail, postage prepaid, on this 28th day of September, 2005.

                          /S/ Anita Johnson